A07A0153. IN THE INTEREST OF H. C. et al., children.
(647 SE2d 333)

ADAMS, Judge.

The parental rights of the father and mother of H. C. and F. M. C. were terminated by an order of the Juvenile Court of Emanuel County. The father and mother filed separate notices of appeal, and the appeals were docketed in this Court as Case No. A07A0152 and Case No. A07A0153, respectively. The father failed to file a brief and enumerations of error after being granted an extension by this Court to do so, and his appeal was dismissed by order dated November 9, 2006.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parents' rights to custody have been lost. *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001). "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met." (Citation omitted.) *In the Interest of C. R. G.*, 272 Ga. App. 161, 162 (611 SE2d 784) (2005).

Viewed in this light, the record shows the following: The older child, F. M. C., was first removed from the home in 2001 when she was

---

[10] See former OCGA § 17-10-2 (a) (prior to its 2005 amendment).
[11] See *Denny v. State*, 226 Ga. App. 432, 436 (13) (486 SE2d 417) (1997).

approximately two months old because of domestic violence issues and alleged alcohol abuse by the mother. In September 2003 both F. M. C. and her younger sister H. C. came into foster care after the father allegedly beat the mother. The Department of Family and Children Services (the "Department") filed a deprivation petition at that time citing allegations of domestic violence and admitted drug use by the mother. Following a hearing, the juvenile court entered a temporary custody order on October 7, 2003. The court noted in the custody order that the mother admitted to an ongoing illegal drug addiction and that she was currently seeking assistance with that problem. The court also made a finding that the domestic violence had continued between the parents and that the father had obtained a divorce from the mother and custody of the children without her knowledge by misleading the mother as to the date of the final hearing. The permanency plan at that time was reunification, with both parents required to undergo psychological testing and drug screens. The father was also required to attend batterer's intervention classes.

The juvenile court returned the children to the father's home under a protective order entered in early February 2004. The mother was granted supervised visitation with the children and ordered to continue drug counseling and undergo random drug screens. The parents were also required to participate in family counseling "in preparation for their reunification." The juvenile court subsequently terminated the protective order, finding that the father had complied with his case plan, and that the children were to remain in his custody. The court further found that the mother had not complied with her case plan and that she had failed to attend the hearing held prior to the termination of the protective order.

The children again came into foster care in November 2004 following allegations that the father had bruised the children when he used a paddle to discipline them. At that time the children were again found to be deprived and subsequently placed with a paternal aunt. Both parents were offered reunification plans after the bruising incident. The mother's plan required her to find a job, find stable housing, undergo a drug assessment and random drug screens, attend parenting classes and pay child support. However, the Department subsequently filed a motion to change the plan to a nonreunification plan, contending that the mother had been noncompliant in several ways, specifically that she missed appointments, failed to cooperate with the Department and failed to visit with the children. Following a hearing on June 21, 2005, the plan was changed to a nonreunification plan with the mother's consent.

The Department filed petitions to terminate the parental rights of both parents on July 12, 2005. Both parents testified at the

termination hearing; a caseworker from the Department also testified. At the time of the hearing, the mother testified that she had stable housing, that she lived with her boyfriend, his son and their child, who had been born less than a month before the termination hearing. The mother admitted that she had used crack cocaine in the past, and specifically admitted to using crack cocaine during the summer of 2004 but testified that she was now drug free except for an "isolated" incident in January 2005. The mother also admitted that she was pregnant at the time she used drugs in January, but testified that she did not know she was pregnant at that time. However, the mother also testified that the child had been conceived in November. The mother testified she had tested negative on several drug screens, had attended Narcotics Anonymous (NA) and Alcoholics Anonymous on a weekly basis, and had earned her six-month chip for remaining drug free but not her nine-month chip because of the drug use in January.

The mother further testified that she first used crack cocaine when she was 11 years old, but did not use crack again until she moved out of the marital home for the first time in 2003. She testified that her current boyfriend did not use drugs, but after they began living together she would tell him when she was going out to use drugs. The mother also admitted that she continued to use drugs when she first started attending NA meetings because "[she] just wasn't getting it."

The mother further testified that she had been visiting the children every other Thursday, although she did miss the visitation that fell within a few days of when she gave birth to her new baby. She also testified that she was going to look for a job, that she liked to work and did not anticipate any problem finding a job and that she intended to marry her boyfriend, although she was vague about when they planned to wed. However, she did not explain why she had been unemployed for most of the last several years.

The mother admitted that she consented to her case plan being changed to a nonreunification plan, but testified she did so because she thought she could work with her former sister-in-law, with whom the children had been placed at that time, on getting back custody of the children. She stated that at the time "[she] felt like it would be better to get DFACS out of the picture. . . ." She also acknowledged her failure to pay child support for the children, and said that it was because she did not have a job, although she realized that was not "really an excuse." The mother said she knew that she did not complete all of her prior case plan, but that she believed that if she were given another six months, she could do what she needed to do to be reunited with her children.

A social worker from the Department also testified. She described the mother's compliance with her prior case plan as "luke-warm." She also testified that the mother failed to visit the children while they were with the paternal aunt, and confirmed the mother's testimony that she had failed to get a job, attend parenting classes or pay child support as required by the case plan. It was her opinion that the mother had not demonstrated that she had corrected the issues that led to the finding that the children were deprived and that the deprivation would be continuing and on-going. The social worker also opined that the mother's unstable situation and being in and out of the children's lives was detrimental to the children and that they needed stability, attachment and to know where their home is. She felt that long-term foster care was harming them developmentally, psychologically, and socially and that another year in foster care would be harmful to them.

Georgia law provides for a two-step process that must be followed in determining whether to terminate parental rights. OCGA § 15-11-94 (a) requires that the trial court "first determine whether there is present clear and convincing evidence of parental misconduct or inability." Parental misconduct or inability is determined under the four criteria set forth in OCGA § 15-11-94 (b) (4) (A) (i)-(iv). Those four factors are: (1) the child is deprived; (2) the lack of proper parental care and control by the parent whose rights are being terminated is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are shown to exist by clear and convincing evidence, then the court must also determine whether termination of parental rights is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child . . . , including the need for a secure and stable home. OCGA § 15-11-94 (a)." *In the Interest of C. M.*, 275 Ga. App. 719 (621 SE2d 815) (2005).

On appeal, the mother challenges the sufficiency of the evidence only as it pertains to the second and third criteria — the lack of proper parental care and control by the mother is the cause of the deprivation and the cause of the deprivation is likely to continue; thus we will limit our review accordingly.

*Lack of proper care and control by the mother*: The mother argues that, at the time the children were last removed from the home in 2004, the father had legal custody of the children and she no longer resided there and had nothing to do with the corporal punishment incident that caused the children to be removed from the home. She also argues that it was the father's acts of domestic violence that caused the children to be removed from the home on other occasions. But this argument ignores much of the evidence in the record,

including the fact that when the children were removed from the home in September 2003 the mother was admittedly using drugs, and that the juvenile court cited the mother's drug use in finding the children to be deprived. Thus it was not *only* the issues of domestic violence that caused the children to be adjudicated deprived and removed from the home in the prior incidents. Moreover, when the children were returned to the home following their removal in 2003, they were returned to the father and not the mother, and the juvenile court specifically found in the order terminating the protective order that the father had complied with his case plan but the mother had not. And when the children were subsequently removed from the father's home and placed with a paternal aunt, the mother did not visit them or maintain a meaningful bond with them and did not contribute to their support, although she, as well as the father, had been offered a reunification plan during this time. Because of the mother's failure to comply with the reunification plan in place at that time, the Department subsequently filed a motion to change the plan to one for nonreunification. The mother agreed to this change, and the plan was changed to a nonreunification plan with the mother's consent.

The mother continued to fail to contribute to the support of the children when the children were removed from their aunt's home and placed with a foster family. Moreover, this failure is particularly telling in that the mother maintained that she and her current boyfriend could financially take care of the children even if she did not work, yet she did nothing to demonstrate her willingness to contribute to the children's support. "Georgia law requires a parent to financially support his or her child while the child is in foster care, even in the absence of a court order and even if unable to earn income. [Cits.]" *In the Interest of A. R. A. S.*, 278 Ga. App. 608, 613 (2) (c) (629 SE2d 822) (2006). Likewise, the mother's failure to visit with the children over time showed that the mother had failed to maintain a meaningful supportive parental bond with her children. The mother also admitted at the hearing that she had not yet taken all the steps she knew would be necessary before she could be reunited with her children, although she felt like she would have no problem doing so if she were given more time.[1] But the mother had repeatedly failed to take the actions required of her, and the evidence summarized here plus other evidence of record clearly supports the juvenile court's finding that the mother's actions or inactions also caused the children

---

[1] Although the mother argues that we cannot consider her failure to comply with her most recent reunification plan since it had been in place for less than one year, it was clear that the mother understood what she needed to do to get her children back from her prior plan and that she admittedly had not yet met those goals.

to be without proper care and control, resulting in their deprivation. See OCGA § 15-11-94 (b) (4) (A).

*Deprivation is likely to continue*: Considering the sufficiency of the evidence to support the finding that the cause of deprivation is likely to continue, we observe that:

> Although it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, *In the Interest of L. G.*, 273 Ga. App. 468, 474 (2) (c) (615 SE2d 551) (2005), it is equally true that "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required." (Emphasis supplied.) *In the Interest of A. M.*, 275 Ga. App. 630, 633 (621 SE2d 567) (2005). However, in considering past deprivations compared to present achievements, juvenile courts are entitled to assign "much less weight to such 'assertions of sudden parental fitness' when compared to the other evidence." *In the Interest of L. G.*, 273 Ga. App. at 474. And "what weight to give recent improvements is a question for the trier of fact. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Punctuation and footnotes omitted.) *In the Interest of A. T. H.*, 248 Ga. App. 570, 573 (1) (547 SE2d 299) (2001).

*In the Interest of D. D. B.*, 282 Ga. App. 416, 418-419 (1) (638 SE2d 843) (2006).

The record in this case shows that the children had been in foster care for most of their lives. During much of that time the mother was not part of the children's lives, did not visit them and failed to support them financially or emotionally. Although she had made recent improvements in her own life, she was still dependent on someone else to provide her with food and shelter. And at the time of the hearing she had been with her current boyfriend less than a year and already had given birth to a child fathered by him. She had not obtained employment, even during the period in which she was not pregnant or was not aware she was pregnant. And although she testified that she and her boyfriend had the financial means to support the children, she had contributed nothing to their support as of the date of the hearing. "In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." *In the Interest of D. D. B.*, 282 Ga. App. at 419 (1). See also *In the Interest of*

*S. G.*, 271 Ga. App. 776, 781 (611 SE2d 86) (2005) ("The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."). The juvenile's court's findings as to this factor were also supported by clear and convincing evidence, and the order terminating the mother's parental rights is thus affirmed.[2] See also *In the Interest of B. L.*, 278 Ga. App. 388, 393-394 (1) (629 SE2d 89) (2006), and cites.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED JUNE 1, 2007.

*Tracy J. Mullis*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Jason S. Naunas, Mark J. Cicero, Assistant Attorneys General, Lance J. Hamilton*, for appellee.

---

[2] As the mother does not challenge the sufficiency of the evidence to support the juvenile court's conclusion that termination of the mother's parental rights was in the best interests of H. C. and F. M. C., we need not consider that issue.